J-A10037-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAQUAN MARQUIS LEE | : | |
| | : | |
| Appellant | : | No. 547 EDA 2022 |

Appeal from the Judgment of Sentence Entered January 13, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006412-2019

MEMORANDUM PER CURIAM: **FILED JUNE 20, 2023**

Jaquan Marquis Lee appeals from the January 13, 2022 aggregate judgment of sentence of life imprisonment imposed after a jury found him guilty of first-degree murder and criminal conspiracy to commit murder.[1] After careful review, we affirm the judgment of sentence.

The factual history of this case was set forth at great length in the trial court's June 15, 2022 opinion and need not be reiterated in full here. *See* trial court opinion, 6/15/22 at 4-40. The relevant facts and procedural history of this case were summarized as follows:

> [Appellant's] convictions arose out of a conspiracy with co-defendants, Derrick Goins and Kyshan S. Brinkley, to murder Keith Robinson, a rival drug dealer to the home-grown Pottstown gang, Bud Gang Bitch ("BGB").  On March 30, 2019, at about 10:53 p.m.,

---

[1] 18 Pa.C.S.A. §§ 2502(a) and 903(a)(1), respectively.

the victim's vehicle was sprayed with bullets, while the victim was parked at the corner of York and Walnut Streets, Pottstown. Two of the ten bullets hit the victim and killed him.

The evidence showed that [Appellant] was involved in the conspiracy to murder the victim. Earlier on in the evening on March 30, 2019, [Appellant] was with his co-defendants Brinkley and Goins at a social gathering at Chestnut and Evans Streets. Several witnesses identified [Appellant] as being present with them at that location. Before [Appellant] left the gathering he told someone there that he was going to "do something, handle something." They left that location. [Appellant] and codefendant Goins were specifically observed to have left in a black minivan together, driven by [Appellant]. All three co-defendants arrived together in the black minivan to an apartment complex at 206 Manatawny Street a short time later.

In between the time they all left the gathering and arrived at Manatawny Street, the victim was murdered. During the time of the murder, the black minivan was captured twice on surveillance in the vicinity of the victim's car. Video surveillance which depicting both York and Walnut Streets, captured an individual in the video frame, which matched up with the audio from another video surveillance that recorded the sound of gunshots.

After leaving 206 Manatawny Street in the black minivan, [Appellant] and his co-defendants traveled to a gas station, and then onto the club in Philadelphia.

Although [Appellant's] cell phone could not be recovered, his codefendants' cell phone records from the night of the night of the murder show that the movements of both co-defendants' cell phones put them in the area of the murder at the relevant time, traveling back to 206 Manatawny Street afterwards, a short time later their cell phones traveled to a gas station, and then to the Uncut club in Philadelphia.

- 2 -

Surveillance footage corroborated that a black van was at the murder scene, at 206 Manatawny Street, and at a nearby gas station at times that match up to the cell phone records. The surveillance also captured [Appellant] get out of the black van to go into the gas station's minimart.

Further evidence showed that [Appellant], along with co-defendant Brinkley, was a member of the BGB gang, through rap videos, rap lyrics, social media accounts, and gang expert testimony; and that the gang was involved in drug trafficking. Co-defendant Brinkley had confessed to a fellow inmate at Montgomery County Correctional Facility to his involvement in the murder and the motive for the murder, i.e., that it was drug-related.

Moreover, [Appellant] was established as the shooter in the conspiracy. The shooter was captured on video surveillance at the murder scene, in which the shooter is wearing a black jacket. A black jacket was recovered from the trashcan outside of 47 Beech Street, a short distance from the murder scene, and it was found in the same area as the tenth fired shell casing. DNA testing of various parts of the jacket, such as the zippers and snaps, revealed that [Appellant's] DNA was on the jacket. [Appellant] was also seen in several photographs wearing that same jacket, which had distinctive features. Further, eyewitness identification saw a male in dark clothing the area of the murder right after each witness independently indicated they heard gunshots fired.

*Id.* at 1-3.

Appellant was subsequently arrested in connection with this incident and proceeded to a joint jury trial alongside his co-defendants on January 3, 2022. At trial, Commonwealth presented testimony from 32 witnesses and the defendants presented testimony from an additional 6 witnesses. Following an eight-day jury trial, Appellant was found guilty of first-degree murder and

criminal conspiracy to commit murder. On January 13, 2022, the trial court sentenced Appellant to an aggregate term of life imprisonment. On January 25, 2022, Appellant filed untimely post-sentence motions challenging the sufficiency and weight of the evidence.[2] The trial court denied Appellant's post-sentence motions on January 31, 2022.

Thereafter, on February 11, 2022, Appellant filed a timely notice of appeal.[3] On February 15, 2022, the trial court ordered Appellant to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b). Following an extension, Appellant filed a timely concise statement on May 16, 2022, and the trial court filed its comprehensive Rule 1925(a) opinion on June 15, 2022.

Appellant raises the following issues for our review:

> I. Whether the trial court abused its discretion and denied [A]ppellant a right to a fair trial by admitting evidence and testimony of gang activity, affiliations, and habits through social media posts, rap videos, rap lyrics, prior bad acts, and testimony by two detectives, one of whom was qualified as a "gang expert," where the probative value of such evidence was minimal under the circumstances of the case and the unfair prejudice to appellant was great?

---

[2] The record reflects that Appellant filed his post-sentence motion one day late. Appellant had until Monday, January 24, 2022 to file a timely post-sentence motion because the tenth day fell on Sunday, January 23, 2022. *See* Pa.R.Crim.P. 720.

[3] Appellant's co-defendants, Kyshan Brinkley and Derrick Goins, filed related appeals at No. 549 EDA 2022 and No. 513 EDA 2022, respectively.

> II. Whether the trial court's admission of co-defendant Kyshan Brinkley's out of court confession to the murder, introduced through the trial testimony of a jail house informant, Elijah Williams, deprived [A]ppellant of his right to confrontation and cross-examination at the joint trial in which Brinkley was alleged to have acted in concert with [Appellant]?
>
> III. Whether there was sufficient evidence to support the verdict of guilt as to the charge of first degree murder and conspiracy to commit the same?

Appellant's brief at 4.

## I. Admissibility of Prior Bad Act Evidence and Expert Testimony

Appellant first argues that the trial court abused its discretion admitting evidence and testimony of gang activity, including numerous social media posts, rap videos, and lyrics, as well the expert opinion testimony of Lieutenant Erick Echevarria on gang structure and drug trafficking. Appellant's brief at 21-30.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa.Super. 2012) (citation omitted), *appeal denied*, 76 A.3d 538 (Pa. 2013).

It is well settled that "evidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283

(Pa.Super. 2004) (*en banc*); *see also* Pa.R.E. 404(b)(1). Nevertheless, "[e]vidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Id.* Specifically, evidence of other crimes or bad acts is admissible evidence of other crimes may be introduced to show:

> motive; intent; absence of mistake or accident; a common scheme or plan; and identity. The evidence may also be admissible to impeach the credibility of a testifying defendant; to show that the defendant has used the prior bad acts to threaten the victim; and in situations where the bad acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development.

*Commonwealth v. Reid*, 811 A.2d 530, 550 (Pa. 2002) (citations and numeration omitted), *cert. denied*, 540 U.S. 850 (2003); *see also* Pa.R.E. 404(b)(2). When offered for a legitimate purpose, evidence of prior crimes or bad acts is admissible "if the probative value of the evidence outweighs its potential for unfair prejudice." *Commonwealth v. Hairston*, 84 A.3d 657, 665 (Pa. 2014) (citation omitted), *cert. denied*, 574 U.S. 863 (2014).

Additionally, expert testimony is admissible if it concerns a subject beyond the knowledge, information, or skill possessed by the average layperson, as phenomena and situations that are matters of common knowledge may not be the subject of expert testimony. Pa.R.E. 702.

> [I]n cases involving the admission of expert testimony . . . the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible

when it is based on facts of record and will not cause confusion or prejudice.

*Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa.Super. 2013) (citation omitted), *appeal denied*, 80 A.3d 775 (Pa. 2013).

## II. Confrontation Clause

Appellant next argues his right to confrontation was violated when the trial court permitted Elijah Williams to testify to incriminatory statements Appellant's co-defendant Brinkley made to him when he was incarcerated. Appellant's brief at 31-35.

"[W]hether a defendant was denied his right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Tejada*, 161 A.3d 313, 317 (Pa.Super. 2017) (citation and internal quotation marks omitted).

Pennsylvania law is clear that statements of a non-testifying co-defendant are admissible at a joint trial as long as they avoid express references to a non-declarant defendant, and the trial court gives a proper limiting instruction advising the jury that they may only consider the statement against the defendant who made the statement. *See Commonwealth v. Cannon*, 22 A.3d 210, 218 (Pa. 2011); *Commonwealth v. Miller*, 819 A.2d 504, 511-513 (Pa. 2002), *cert. denied*, 540 U.S. 827 (2003); *Commonwealth v. Travers*, 768 A.2d 845, 850-851 (Pa. 2001).

## III. Sufficiency of the Evidence

Lastly, Appellant argues that there was insufficient evidence to sustain his conviction for first-degree murder and criminal conspiracy to commit murder. Appellant's brief at 35-40.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Thomas*, 988 A.2d 669, 670 (Pa.Super. 2009) (citations omitted), *appeal denied*, 4 A.3d 1054 (Pa. 2010).

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that Appellant's claims on appeal warrant no relief. In its extensive 62-page opinion, the trial court comprehensively discussed each of Appellant's allegations of error and concluded that they are without merit or waived. *See* trial court opinion, 6/15/22 at 40-62. We find that the trial court's conclusions are supported by competent evidence and are clearly free of legal error.

Accordingly, we adopt the comprehensive June 15, 2022 opinion of the Honorable William R. Carpenter as our own for purposes of this appellate review.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/20/2023

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :      CP-46-CR-0006412-2019

V.                                  :

JAQUAN MARQUIS LEE                   :      **547 EDA 2022**

**1925(a) OPINION**

**CARPENTER  J.**                          **JUNE 15, 2022**

INTRODUCTION

Appellant, Jaquan Marquis Lee ("Lee"), appeals from the January 13, 2022, judgment of sentence imposed following his conviction of first-degree murder and conspiracy. Lee was sentenced to a life-term of imprisonment.

Lee's convictions arose out of a conspiracy with co-defendants, Derrick Goins and Kyshan S. Brinkley, to murder Keith Robinson, a rival drug dealer to the home-grown Pottstown gang, Bud Gang Bitch ("BGB"). On March 30, 2019, at about 10:53 p.m., the victim's vehicle was sprayed with bullets, while the victim was parked at the corner of York and Walnut Streets, Pottstown. Two of the ten bullets hit the victim and killed him.

The evidence showed that Lee was involved in the conspiracy to murder the victim. Earlier on in the evening on March 30, 2019, Lee was with his co-defendants Brinkley and Goins at a social gathering at Chestnut and Evans Streets. Several witnesses identified Lee as being present with them at

that location. Before Lee left the gathering he told someone there that he was going to "do something, handle something." They left that location. Lee and co-defendant Goins were specifically observed to have left in a black minivan together, driven by Lee. All three co-defendants arrived together in the black minivan to an apartment complex at 206 Manatawny Street a short time later.

In between the time they all left the gathering and arrived at Manatawny Street, the victim was murdered. During the time of the murder, the black minivan was captured twice on surveillance in the vicinity of the victim's car. Video surveillance which depicting both York and Walnut Streets, captured an individual in the video frame, which matched up with the audio from another video surveillance that recorded the sound of gunshots.

After leaving 206 Manatawny Street in the black minivan, Lee and his co-defendants traveled to a gas station, and then onto the club in Philadelphia.

Although Lee's cell phone could not be recovered, his co-defendants' cell phone records from the night of the night of the murder show that the movements of both co-defendants' cell phones put them in the area of the murder at the relevant time, traveling back to 206 Manatawny Street afterwards, a short time later their cell phones traveled to a gas station, and then to the Uncut club in Philadelphia. Surveillance footage corroborated that a black van was at the murder scene, at 206 Manatawny Street, and at a nearby gas station at times that match up to the cell phone records. The surveillance also captured Lee get out of the black van to go into the gas station's minimart.

2

Further evidence showed that Lee, along with co-defendant Brinkley, was a member of the BGB gang, through rap videos, rap lyrics, social media accounts, and gang expert testimony; and that the gang was involved in drug trafficking. Co-defendant Brinkley had confessed to a fellow inmate at Montgomery County Correctional Facility to his involvement in the murder and the motive for the murder, i.e., that it was drug-related.

Moreover, Lee was established as the shooter in the conspiracy. The shooter was captured on video surveillance at the murder scene, in which the shooter is wearing a black jacket. A black jacket was recovered from the trashcan outside of 47 Beech Street, a short distance from the murder scene, and it was found in the same area as the tenth fired shell casing. DNA testing of various parts of the jacket, such as the zippers and snaps, revealed that Lee's DNA was on the jacket. Lee was also seen in several photographs wearing that same jacket, which had distinctive features. Further, eyewitness identification saw a male in dark clothing the area of the murder right after each witness independently indicated they heard gunshots fired. With all this evidence the jury convicted Lee of conspiring with his co-defendants to murder the victim.

On appeal, Lee challenges the weight of the evidence; the sufficiency of the evidence; several pre-trial rulings regarding gang-related evidence; the introduction of a Commonwealth witness's grand jury testimony; and the introduction of the testimony of Commonwealth witness, Elijah Williams.

3

## FACTUAL AND PROCEDURAL HISTORY

On January 3, 2022, the eight-day jury trial commenced where the following facts were established. The Commonwealth first presented the trial testimony of Gregory Byrd, the victim's younger brother. (N.T., Trial by Jury, Day 2 of 8, 1/4/22. P. 65). Mr. Byrd testified that his brother was living in Pottstown and had lived there for about 18 years, however, he was born and raised in Philadelphia. Id. 66 – 67. The victim was 41-years-old at the time of his murder, and was also known as Naz and Esco. Id. at 65, 67, 84. At the time of his murder, Mr. Robinson worked in construction, and he also sold cocaine with Mr. Byrd. Id. at 68.

In the morning of March 30, 2019, Mr. Byrd was selling drugs, while his brother was out riding his motorcycle. Id. at 69. He delivered drugs to individuals he knew as KK and Valerie. Id. Mr. Byrd and the victim met up later that day, but went their separate ways at 10:00 p.m., until the victim returned to help him with a flat tire. Id. at 70 – 72. The victim arrived in a green Infinity Jeep, and drove his brother back to his apartment. Id. at 72 – 73. That was the last time they saw each other. Id. at 74.

At approximately 10:53 p.m., Officer Andrew Licwinko of the Pottstown Borough Police Department, responded to the area of York Street and Walnut Street in Pottstown for shots fired in that area. Id. at 98, 99 – 100. Upon his arrival there he observed a dark-colored Infinity parked close to the intersection, with the passenger window broken out. Id. at 100. A volunteer firefighter was on the driver's side tending to a male, who was slumped over in

4

the driver's seat, and later identified as Keith Robinson. Id. at 100 – 101. Officer Licwinko, along with the firefighter, pulled the victim from his car. Id. at 101. He had multiple gunshot wounds to his chest and neck, and no pulse. Id. The victim was transported to the hospital, where he was pronounced dead. Id. at 102. Officer Licwinko secured the crime scene and identified eight spent shell casings. Id. at 105 – 106.

Karen Clarke was a resident of 128 North York Street, in March of 2019. Id. at 140. Ms. Clarke, a/k/a KK, lived in the first floor apartment and Valerie Miller was her neighbor in the second floor apartment. Id. at 141, 144. Ms. Clarke knew the victim, who she called Naz, because she bought cocaine from him in the past. Id. at 142. On the day of the murder, Ms. Clarke texted the victim around 7:00 p.m. and then around 10:00 p.m. At 10:47, the Mr. Robinson texted back, "Outside." Ms. Clarke alerted Ms. Miller that the victim was there. Id. at 150. A few minutes later, Ms. Clarke heard gunshots. Id. at 150. Ms. Clarke made her way to the front door and yelled to Ms. Miller to come back inside. Id. Ms. Miller got out of the car and said, "Oh, my God, Naz been shot. So call 9-1-1." Id. Ms. Clarke retrieved her phone from inside the house, and went outside by the driver's side of the victim's car and called 9-1-1. Id. at 150 – 151.

Valerie Miller testified that she knew the victim through his girlfriend, Renada. Id. at 179. On March 30, 2019, she and Ms. Clarke were trying to buy drugs from him. Id. at 180. At some point when the victim was

5

there, Ms. Miller got into his car, and while in the car she heard gunshots being fired. Id. at 181 - 182.

Dr. Gregory McDonald, the Chief Deputy Coroner for Montgomery County, performed an autopsy on the victim on March 31, 2019. Id. at 209, 217. Dr. McDonald's examination revealed two entrance gunshot wounds, one on the right side of the neck and the other to the right side of the chest. Id. at 218. Dr. McDonald concluded that the victim died of multiple gunshot wounds. Id. at 227. He opined that either gunshot wound was potentially fatal, and that the victim would have died within several minutes from these injuries. Id.

Detective Robert Turner, a detective with the Montgomery County Detective Bureau – Forensic Services Unit, was called to the scene of the crime and arrived around 12:15 a.m. Id. at 234, 237 – 238. Detective Turner did a scene walk-through. Id. at 239. The detective testified that based upon the shell casings that were identified, shooter would have about 30 feet to 46 feet away from the passenger door of the victim's vehicle. Id. at 243 – 244. Detective Turner recovered nine spent shell casings. Id. at 245. They were all .40-caliber, manufacturer was Smith and Wesson and two brands, Blazer and CBC. Id. at 247 – 248.

Detective Turner was contacted by Lieutenant Kuklentz about twenty minutes after his arrival to go to an additional location at 47 Beech Street, about a block and a half from the crime scene. Id. at 260, 262. He and Detective Schanes went there and spoke to Detective Kelly. Detective Kelly had located a black jacket inside a residential dumpster right outside the 47 Beech

6

Street residence. Id. at 260 – 261. An orange Bic cigarette lighter was found in the jacket's pocket. Id. at 266. Directly across from 47 Beech Street is 44 Beech Street, and laying on the curb line on the roadway, the detective recovered another .40-caliber Smith and Wesson, brand CBC spent, fired shell casing. Id. at 268 – 269, 272.

Detective Kathleen Kelly, of the Montgomery County Detective Bureau responded to the crime scene in the area of York and Walnut Streets. (N.T., Trial by Jury – Day 3 of 8, 1/5/22, p. 8). Detective Kelly and Detective Mull from Pottstown, walked around the crime scene and found a jacket in a trash can, located right in front of 47 Beech Street. Id. at 10 - 11, 12. The jacket was laying right on top of the trash. Id. at 11.

Johnny Walker, the resident at 47 Beech Street, testified that on March 30, 2019, he took the trash out around 4:00 or 4:30 p.m. Id. at 32. That night he was on the couch in his first floor living room when he heard gunshots. Id. at 33. He also heard the trash can lid open and shut, and someone put trash inside. Id. Mr. Walker told detectives that the jacket did not belong to him or any other resident at 47 Beech Street. Id. at 34.

Elias Scipio, a volunteer firefighter back in March of 2019, and on March 30, 2019, at around 10:00 or 10:30 p.m., he was on Walnut Street to pick up his friend. Id. at 50 – 51. He was looking for parking, and when he pulled into Union Alley, he witnessed a male walking towards his vehicle. Id. at 53. Mr. Scipio described the male as a light-skinned male, athletic build, with twists in his hair. Id. The male was pacing back and forth. He started to

7

approach Mr. Scipio's vehicle, which made him feel uncomfortable so he left the alley. Id. at 54. Mr. Scipio got a good look at the individual and further described him as wearing dark-colored clothing, such as a dark-color hoodie or jacket. Id. at 55, 57. On May 3, 2019, Mr. Scipio spoke with Lieutenant James McGowen at the Pottstown Police Department. Id. at 57 – 58, 96. There he identified co-defendant Goins as the individual he observed in the alleyway in a photo array. Id. at 63, 65, 96, 102.

After leaving the that neighborhood for a period of five minutes, Mr. Scipio returned and observed a vehicle sitting on the corner with all of its windows shattered and two females standing outside the vehicle. Id. at 67 – 68. He got out of his car, and attempted to assist the victim. Id. at 68.

Lieutenant Todd Richard of the Montgomery County Detective Bureau - Homicide Unit and lead detective reviewed various items of video surveillance, namely footage from the Pottstown Borough cameras. Id. at 112 - 114. He was on alert to look for a black Dodge minivan, which had been identified by witnesses as a vehicle that suspects were seen in before and after the murder. Id. Also during the course of his investigation he received information that the suspects were at a gathering on Chestnut and Evans Streets. Id. at 116.

The Commonwealth played a video surveillance clip taken about a block and a half away from that gathering. Id. at 117. The lieutenant identified the black Dodge minivan which at 10:45 p.m. had left from Chestnut Street and turned onto Washington Street. Id. Additional video depicted the black

8

Dodge minivan at about 10:51 p.m., go westbound on Walnut Street and travel on Walnut Street towards the intersection of Walnut and York Streets. Id. at 118, 120 – 121, 130. An individual from the right side of the video frame walked to the middle of the video frame, and the individual goes out of the frame at the top of the video. Id. at 132, 134. The individual runs back from the left to the right of the video frame. Id. Further, video was obtained from 26 Walnut Street, in which the audio recorded gunshots at 10:52 p.m. Id. at 122 – 123,126 – 128.

Jamar Baird[1] testified that on March 30, 2019, he was at the Chestnut and Evans Streets gathering, and he was there with "Key", identified in court as co-defendant Brinkley. Id. at 161 – 162. Mr. Baird acknowledged that at some point that night there was a plan to go to a club in Philadelphia. Id. at 162. Before they drove down to the club, he went with "E" to Beech and Manatawny. Id. at 163 – 164. Using the grand jury testimony to refresh his recollection, Mr. Baird testified that "Swizz" "and them pulled off" from Chestnut and Evans Street right before he left with "E." Id. at 165 – 166. Mr. Baird identified in court that "Swizz" as Lee. Id. at 167. According to Mr. Baird's grand jury testimony, "D" might have been in the van with Swizz. Id. at 166 – 167. He identified in court that "D" as co-defendant Goins. The Court dismissed Mr. Baird, subject to recall. Id. at 170.

---

[1]     Upon questioning by the Commonwealth, Mr. Baird did not have any independent memory of the events of March 30, 2019. (N.T., Trial by Jury - Day 3 of 8, 1/5/22, pp. 155 – 156). The Commonwealth presented him with a transcript of his grand jury testimony taken on May 15, 2019. Id. at 157. He continued to claim that he did not remember anything from March 30, 2019. Id. at 158 – 159. It did not refresh his recollection. Id. at 160.

Jahtae Booker, was also at the gathering at Chestnut and Evans Streets. Id. at 171. Mr. Booker testified that co-defendant Goins was present. Id. at 193. Several minutes after arriving, Ms. Booker left, and, at the direction of Lee, he dropped his friend off at 206 Manatawny Street. Id. at 171, 172 – 173. A short time later when he got to 206 Manatawny Street, Mr. Booker heard gunshots coming from a distance. Id. at 174, 194. Mr. Booker testified that Lee and co-defendant Goins were in the parking lot of 206 Manatawny Street. Id. at 174 – 175, 184. Mr. Booker left the area. Id. at 175.

Upon further questioning, Mr. Booker did not remember answers to questions he previously testified to at a grand jury. Id. at 176. The Commonwealth introduced his June 5, 2019 grand jury testimony where he testified that the vehicle he saw that went to the club in Philadelphia was at the Gulf gas station, and it was a van. Id. at 176 – 178. At the club, Mr. Booker saw Lee and co-defendants Brinkley and Goins. Id. at 190. They all stayed until closing time. Id. While nobody talked about the murder, people were posting stuff about the victim's death. Id. at 191.

Additional video surveillance was recovered by both Detective Brooke Hatfield and Detective Michael Glauner, both of the Pottstown Police Department. The former recovered surveillance from 112 Walnut Street[2], 26 Walnut Street, and from the Gulf station[3]. Id. at 211 - 212. Detective Glauner

---

[2]   Detective Hatfield testified that the time stamp on the video from 112 Walnut Street was one hour slow from real time. (N.T., Trial by Jury – Day 3 of 8, 1/5/22, p. 213).

[3]   The video from the Gulf station was about 15 minutes fast. Id.

10

recovered video footage from the camera located at Chestnut and Washington Streets. Id. at 265.

Comese Robinson, a resident of 107 Walnut Street, Unit F, Foundry Apartments, testified that on the night of the murder, just before 11:00 p.m., he heard gunshots. Id. at 278, 280. After waiting about two minutes, he saw a figure running though the parking lot on York Street towards Beech Street. Id. at 280, 281. The figure was wearing all black and was hunched over with something in his right pocket. Id. at 282. At the corner of York and Beech streets, the figure went to turn onto Beech Street, but did an about face and pulled the hood off his head. Id. at 283. There was a police officer at the corner of Beech and York. Id. After the police drove by, the individual continued to go back around the corner down Beech Street. Id. at 284.

Robert Garcia, a resident of 48 Beech Street, testified that on March 30, 2019, he was across the street from his house when he heard gunfire. Id. at 298. He and his wife went back to their house, and as he set stuff down inside the door he turned around and saw someone coming down the sidewalk on Beech Street. Id. at 299. The person was about 25 yards south of York Street headed toward Manatawny Street. Id. The person went right into the alleyway, between 47 and 43 Beech Street, and stopped. Id. at 301. Mr. Garcia testified that the person was wearing sweats and a hoodie, dark in color. Id. at 302. The person had his right hand inside the right side of the jacket or hoodie. Id. at 303 – 304.

11

Lieutenant Todd Richard was recalled to testify. (N.T., Trial by Jury – Day 4 of 8, 1/6/22, p. 11). Lieutenant Richard testified that the investigation into the murder was lengthy. Id. at 12. On April 9, 2019, he became aware that a black van was involved in the murder, and then investigators developed more information about the van. Id. at 13. On April 10, 2019, video footage was taken from the Gulf gas station, when he found out that location was relevant. Id. at 13 – 14. He further discovered that 206 Manatawny Street location was involved in this investigation, and he obtained video footage from there. Id. at 14. A drone video was also made in order to demonstrate the crime scene, as to where the shooting occurred, where the jacket was found, where the shell casing was recovered, and the alleyway that they ran to after the shooting. Id. at 14 – 15. Lieutenant Richard testified that to travel by car from York and Walnut Streets to 206 Manatawny, it would take a minute or less. Id. at 21 – 22.

Lieutenant Richard also obtained video from the exterior of 206 Manatawny Court Apartments, and he gathered information about individuals associated with that apartment C2. Id. at 22. He obtained a cell phone picture of four guns that had been taken inside that apartment prior to the murder. Id. The lieutenant watched the video from about 9:00 p.m. up until 11:30, 12 o'clock on the night of the murder. Id. He was watching for a black van pulling into the parking lot. Id. at 23. The van had several distinctive features, and at 11:00 p.m., this black van backs into the parking lot at Building 206. Id. at 24 – 25. The video depicts several people entering the doorway of the apartment

12

building, and the door opening to where C2 would be. Id. at 25 – 26. At 11:10 p.m., the van pulls out of the parking lot. Id. at 27. At some point in his investigation he became aware that Lee and co-defendants Goins and Brinkley had been driving a black van on the night of the murder. Id. at 76. He also learned that it was co-defendant Goins who had rented a black van. Id. at 75 – 76.

A search warrant was obtained for 206 Manatawny, Apartment C2, and was executed on April 3, 2019. Id. The lieutenant described the apartment as not set up to live in. Id. He detailed what was found in relevant part, a Glock magazine fully loaded in a plastic sandwich bag; a Colt .45 handgun with an extended magazine that was loaded and which had been determined to be stolen out of Philadelphia; a CenterPoint crossbow; a box of Remington .45 ammunition; a plastic bag of .380 caliber ammunition; and a receipt with Jamar Baird's phone number on it. Id. at 28 – 36.

The search also uncovered drugs, and drug paraphernalia, including, plastic vial lids commonly used for packaging illegal narcotics, box of wax baggies commonly used for packaging heroin, measuring cup with white residue, pink lids for vials, grocery bag containing two blocks of a white substance, bags stamped with stamps depicting two guns and the word "shooter", a bag of white powdery substance, blue baggies, purple vial lids, digital scale, and Suboxone patches. Id. at 36 – 47.

Search warrants for several individuals' DNA were obtained, including Lee, co-defendant Brinkley, co-defendant Goins, Jamar Baird, and

13

Elijah Davis. Id. at 52. He also obtained the DNA of Makael Bevins by consent. Id.

Officer Jason Smaron of the Philadelphia Police Department responded to the area of 1700 block of Chancellor Street on June 9, 2020 for a theft of a construction site. Id. at 164. As one of the suspects ran away, he threw a handgun underneath a car before being apprehended. Id. at 165 – 166. Officer Smaron identified the firearm as a Glock .40 caliber, nine-millimeter handgun. Id. at 167.

Taylor Richart, a forensic DNA scientist with the Commonwealth of Pennsylvania was accepted as an expert in the field of DNA profiling. Id. at 179, 182. He performed DNA analysis on the zipper pulls and snaps of the black jacket. Id. at 188. The major component of the profile mixture matched the DNA sample from Lee. Id. at 191. As to the collar strap of the jacket, again the major contributor to that profile mixture was Lee. Id. at 193 – 194.

Jordan Valenci, an employee at Enterprise Rent-A-Car identified a rental agreement in which the rental was picked up on March 29, 2019 at 10:16 a.m., and returned April 2, 2019, at 9:46 p.m. at the Pottstown location. Id. at 286, 288 – 289. It was a 2019 black Dodge Caravan, and was rented by co-defendant Goins. Id. at 289.

Jamar Baird re-took the stand. (N.T., Trial by Jury – Day 5 of 8, 1/10/22, p. 11). The Commonwealth asked again, the question of whether co-defendant Lee was still at the first location, when Mr. Baird left. The Commonwealth read into the record Mr. Baird's grand jury testimony in which

14

he answered that Lee left the gathering before he did, and that co-defendant Lee was going to "do something, handle something." Id. at 12.

Mr. Baird acknowledged that his nickname is "Spazz," and that he used that name as an aspiring rapper. Id. at 13. He put out some rap videos, and in the videos there are references to BGB. Id. Mr. Baird explained that BGB, stands for Bud Gang Bitch, in memory of his close friend, Bud, that passed away. Id. at 13 – 14.

On cross-examination, Mr. Baird denied that Lee was a part of BGB. Id. at 22. In fact, Mr. Baird denied that BGB was a gang, saying it is "nothing to be a part of." Id. at 23. He also denied that co-defendant Goins was a part of BGB. Id. at 41. Further, Mr. Baird testified that BGB was named for his friend, Jordan Scott, nickname Bud, who was shot and killed. Id. at 55 – 56. Mr. Baird rejected the idea that BGB was organized for the purpose of selling drugs in Pottstown. Id. at 56. According to him, it was merely a group organized as a way to remember a close friend that was shot and killed. Id. Finally, Mr. Baird testified that he was walking with co-defendant Brinkley down Walnut Street on the way to the gathering when they saw the victim. Id. at 62. There was no conversation between them. Id. at 65. As to leaving the gathering at Chestnut and Evans, Mr. Baird remembered that Lee left there, and he was driving a van. Id. at 71 – 72.

On re-direct, Mr. Baird testified that when he left Chestnut and Evans, he told Lee that he would meet him at Beech and Manatawny. Id. at 83. Lee arrived at that location about fifteen to twenty minutes after Mr. Baird

15

heard the gunshots. Id. He arrived there driving a van. Id. Mr. Baird also stated that co-defendants Brinkley and Goins were with Lee, and that they arrived in the van. Id. They all left Beech and Mantawny in the van, they picked up two more people, they went to the Gulf gas station, and then straight down to Philadelphia. Id. at 84 – 85.

Detective Eric Nelson of the Montgomery County District Attorney's Officer – Forensics unit- who is the firearm and tool marker examiner for the county and was accepted as an expert in firearm and tool maker identification. Id. at 99, 10 2 – 103. He was involved in the analysis of various ballistic items related to the murder. Id. at 109. He first analyzed ten fired shell casings a/k/a fired cartridge cases, which were .40 caliber, Smith and Wesson. Id. at 111. All ten fired cartridge cases were microscopically examined and the detective determined they were all fired from the same pistol. Id. at 114 – 115. He also received six projectiles, which are bullet specimens, for his review. Id. at 111. Detective Nelson determined that the six projectiles were all consistent with .40 caliber ammunition. Four of the six were consistent with .40 caliber ammunition with the same type of rifling (rifling are those lands and grooves inside a barrel.). Id. at 113. The other two projectiles were too mutilated or distorted and damaged to give a type of rifling. Id.

At the time of his examination, Detective Nelson did not have a firearm to compare to it. He submitted a fired cartridge case to the Integrative

16

Ballistic Identification System ("IBIS")[4]. Id. at 116. The detective was notified that there was a match from a case in Philadelphia. Id. at 117 – 118. It was a high-confidence hit that the shell casing matched a Glock firearm submitted to the IBIS system in Philadelphia. Id. at 119 – 120. The Philadelphia Police Department had the actual semi-automatic pistol that they test-fired and they took one of the test fired shells and submitted that to IBIS. Id. at 120. Detective Nelson went to the Philadelphia Firearms Unit, met with the assigned examiner, and examined the Glock pistol. Id. The detective test fired it himself, and compared the test fires to the shell casings in this case. Id. They were a match. Id. Detective Nelson determined that he Glock pistol from Philadelphia was in fact the pistol that fired the ten shell casings in this case. Id.

Jarid Majors, was a resident of 126 North York Street in March of 2019. Id. at 227. At some point on March 30, 2019, he went to a gathering a Chestnut and Evans Streets around 9:00 p.m. Id. at 228. He was there for about 10 to 15 minutes. Id. He left the gathering, and when he came back home later that night, he saw a lot of cops there. Id. Before he arrived he was aware that someone got shot in front of his house. Id. He denied knowing the victim. Id. at 229 - 230.

Mr. Majors testified that he knew Lee, and he knew him as "Quan" or "Swizz." Id. Mr. Majors had told police in his statement that he has seen Lee

---

[4]    IBIS is a computer-based database that takes digital images of the cartridge case, specifically the microscopic marks left on a fired cartridge case. (N.T., Trial by Jury- Day 5 of 8, 1/10/22, 116). This image is put into the database, and it searches for other fired cartridge cases that have been entered into the IBIS system for a match. Id. at 116 – 117.

at 206 Manatawny Street. Id. at 235 - 236. Mr. Majors also knew co-defendant Brinkley who went by "Key" or "Dread and co-defendant Goins, who went by "D." Id. at 236 - 237. Mr. Majors testified that after he spoke with police regarding the murder, he warned several of his friends that police had gotten their numbers from his phone. Id. at 237 – 238.

Mr. Majors was questioned about BGB, which he was aware of. Id. at 239 – 240. He was also aware that that BGB has put out rap videos, and that he was featured in some of them. Id. at 240.

Kelise Smith was a resident of Pottstown, in March of 2019. Id. at 328. On March 30, 2019, in the afternoon, Ms. Smith was on Chestnut Street and Evans Streets. Id. at 328 – 329, 335. She was there with several of her friends, her sister, Denasia, and her sister's friends. Id. at 330. Ms. Smith further testified that while she was at the gathering at Chestnut and Evan Streets, Lee came by around 9:00 p.m., in the van. Id. at 339. She stated that co-defendant Brinkley and co-defendant Goins were at also Chestnut and Evans Streets hanging out. Id. at 339 – 340, 34. Someone suggested going to a club, and Ms. Smith and her friends went back to Denasia's house to change. Id. at 330, 335. Ms. Smith testified that when they left Chestnut and Evans Streets gathering to get dressed, Lee and co-defendants Brinkley and Goins, were still there. Id. at 357. Ms. Smith and Denasia were back at Denasia's house for about ten minutes, then they got picked up by a van. Id. at 331, 335 - 336. Ms. Smith testified that Lee was driving the van, and also in the van were co-defendant Brinkley, co-defendant Goins, Jamir Baird, and Elijah

18

Davis. Id. at 333, 336 – 337, 341. After they got picked up they stopped at a gas station in Pottstown. Id. at 358.

Sometime that night, Ms. Smith found out that Keith Robinson, who she knew as "Naz," was murdered. Id. at 342. The victim was close with her family, and that is how she knew him. Id. at 342 – 343. The topic came up in the van that Naz had died. Id. at 373 – 375.

The Commonwealth recalled Lieutenant Todd Richard to testify regarding video surveillance that was obtained from the Gulf gas station. Id. at 380. The lieutenant testified that at about 11:27 p.m., the video shows a black van pulled up to the gas station, and that Lee got out the van and walked into the store. Id. at 382. The video from inside the store showed that Lee grabbed a lighter. Id. at 383. The outside video shows co-defendant Goins exit the passenger seat, and that he also went into the store. Id.

On day six of the trial, the Commonwealth presented the expert testimony of Detective William Mitchell, a detective with the Montgomery County Detective Bureau – Homicide Unit. (N.T., Trial by Jury – Day 6 of 8, 1/11/22, p. 6 – 7). He was accepted as an expert of cell phone record analysis. Id. at 10. The detective obtained call details for co-defendant Brinkley, co-defendant Goins, and Eiljah Davis[5]. Id. at 10 – 11. He did not obtain co-defendant Lee's cell phone records because the cell phones that were recovered were activated two weeks after the homicide occurred, and investigators were

---

[5] He explained that he obtained the call records of Davis because he was one of the individuals at the hangout location at Chestnut and Evans Streets, he was in the van, and he also went to the Uncut club in Philadelphia afterwards. (N.T., Trial by Jury – Day 6 of 8, 1/11/22, p. 13).

19

unable to obtain a good cell number for him during the time of the homicide. Id. at 13.

First, the detective spoke about co-defendant Brinkley's cell phone records, stating that on March 30, 2019, at 9:16 p.m., his cell phone was using a cell site on the east end of Pottstown. Id. at 27. Co-defendant Brinkley had no other cellular activity until the following day at 1:18. Id. at 28. However, there were data transmissions during that time, including iMessaging texts, social media accounts, Instagram accounts, and e-mails. Id. at 28.

At 9:48 to 9:57 p.m., co-defendant Goins' cell phone was using a cell site at Shoemaker Road, and the sector is facing the hangout location at Chestnut and Evans Streets. Id. at 29.

Between 10:11 and 10:25 p.m., co-defendant Brinkley's cell phone, using data transmissions, was using a cell site that was in the east end of town, encompassing the gas stations and the hangout location. Id. at 31. Around 10:41 p.m. just prior to the murder, co-defendant Goins' cell phone was using the sector of a cell site that faces the homicide location. Id. at 32.

The detective next testified about a still image from video surveillance footage in the area of the homicide showing a black minivan by the building, with the victim's vehicle off to the side of the video still shot. Id. at 33. The 9-1-1 call was at 10:53 p.m. Id. at 33. A few minutes after the homicide co-defendant Brinkley's cell phone was hitting the tower right by the homicide location. Id. The detective identified a still shot image of the van arriving at 206 Manatawny Street just after the homicide occurred at 11:01 or 11:02 p.m. Id.

20

From 10:57 to 11:14 p.m., there were several incoming calls sent to voice mail, and at that time the cell site tower was across the river in Chester County[6], and then the cell phone was using the cell site that was off Shoemaker Road, which is .2 miles away from 206 Manatawny Street. Id. at 34, 36. From 11:12 to 11:19 p.m., co-defendant Brinkley's cell phone was using the Shoemaker Road tower exclusively. Id. at 36. That is the location where the still image showed the van pulling in to 206 Manatawny Street. Id.

Sometime after 11:25 p.m., the detective testified that co-defendant Brinkley's cell phone began using multiple cell towers during a data transmission, and moved to the cell site by the gas station. Id. At that time, the detective noted that in the surveillance video the van pulled into the gas station. Id. Therefore, the cell phone records are consistent with co-defendant Brinkley's cell phone leaving the area of 206 Manatawny Street and going to the gas station where the van pulls in. Id.

As to co-defendant Goins' cell phone, there were two cell sites being utilized, the first which faced the sector at Manatawny Street, and the second cell site, it faced the gas station location, and there was a NELOS[7]

---

[6]    The detective testified that he often with cell phones that are down in the area of the southern portion of Pottstown that the cell site across the river in Chester County will be used because of its location it provides good access to the southern portion of Pottstown. (N.T., Trial by Jury- Day 6 of 8, 1/11/22, p. 34 – 35). The detective explained that whenever a cell phone is utilizing a tower, it is not necessarily the tower that is closest, but rather the tower with the strongest signal. Id. at 35. He further stated that in his experience it is usually the closest tower but not always the case. Id. That is the reason that he compares other evidence in the case when evaluating the call records. Id.

[7]    A NELOS record is information specific to AT&T, where it provides handset information in a general area, represented by a circle around a location. The circle can be bigger or smaller depending on AT&T's calculation of where the handset it located. (N.T., Trial by Jury- Day 6 of 8, 1/11/22, p. 26).

record for the time frame when the van actually pulls into the gas station. Id. at 37. The NELOS record encompassed where the gas station location, where they end up driving to, during that time frame. Id. Detective Mitchell opined that this is indicative of the cell phone leaving the area of Manatawny and going towards the area of the gas station. Id.

The detective showed snapshots at 11:28 where that van pulled into the gas station, and co-defendant Goins' entered the store at the gas station at 11:30 p.m. Id. at 38. After the van left the gas station, the cell sites for Brinkley travel and go into Philadelphia, to the area of the Uncut club. Id. The cell phone arrived, and used towers in the area of the club at 12:42 a.m. Id.

Co-defendant Goins' cell site information during this time is consistent with traveling from the area of the gas station and traveling to the Uncut club, but his cell phone arrives there a little bit later, around 1:05 a.m. Id. at 39 – 40. After 2:14 a.m., the records show that the cell phones leave the area of the Uncut club and begin to travel north. Id. at 40. Co-defendant Brinkley's cell phone travels north, past the vicinity of Gratz Street, where the murder weapon was eventually found. Id. at 40 - 42. Detective Mitchell testified that this route taken by co-defendant Brinkley's cell phone was not the most direct route back to Pottstown. Id. at 41 – 42. Co-defendant Goins' cell phone travels the same trajectory, leaving the club around 2:05 a.m., traveling north, and then traveling in a western and northern direction back to Pottstown. His

cell phone was accessing cell sites in Pottstown at 3:47 a.m. Id. at 42. Co-defendant Brinkley's cell phone accessed cell site towers in Pottstown at 3:57 a.m. Id. at 43.

Next to testify was Elijah Williams, an inmate at Bucks County Correctional Facility. Id. at 118. He had been incarcerated in Montgomery County Correctional Facility in the summer of 2021. Id. Around June and July 2021, he was on the K-4 unit, cell 422. Id. at 118 – 119. Although he did not have a cellmate, he was able communicate with other prisoners directly next door to his own cell. Id. at 119. In the summer of 2021, he spoke to a prisoner who identified himself as Dread, later determined to be co-defendant Brinkley. Id. at 120. Co-defendant Brinkley was in the adjacent cell to Mr. Williams'. 424. Id. In the course of several conversations, the topic of a homicide on March 30, 2019, in Pottstown came up. Id. at 121. Co-defendant Brinkley asked Mr. Williams if he knew a guy named Naz and told him that Naz's real name was Keith. Id. at 122. Mr. Williams told co-defendant Brinkley that he was in Pottstown in August of 2020. Co-defendant Brinkley responded, "oh, the guy was long gone by then," and he laughed about it. Id. Co-defendant Brinkley told Mr. Williams that he was the one charged with that homicide. Id. He confided in Mr. Williams, telling him specifics of the murder. Id. at 123. He relayed that he and some friends were in a van and they drove past where the guy was and they saw him sitting in the car. Id. They parked the van somewhere away from cameras because he knew where in Pottstown the cameras were. Id. He walked to the car the guy was sitting in, and walked up

23

alongside of the car. Id. Co-defendant Brinkley said that the guy never saw it coming. Id. Co-defendant Brinkley described it as, he walked up on him, pop, pop, pop, pop, pop, pop. Id. at 124. He said he ran off and got rid of everything and wound up selling the strap[8] to his folks in Philadelphia. Id. Co-defendant Brinkley believed the gun would be used in a murder in Philadelphia, and if so, then the person who got caught with the gun in Philadelphia would be thought of as Naz's killer. Id.

Mr. Williams further testified that co-defendant Brinkley revealed his motive, telling him that Naz was an old guy, like 40-something, 20 years older than him, and was still out there hustling, and that his time was up. Id. at 126. Co-defendant Brinkley and his team wanted to take over his business and the guy was in the way. Id. He wasn't from Pottstown, he was from Philadelphia, and that annoyed him. Id. Mr. Williams explained that by hustling, he was referring to that Naz was selling drugs. Id. at 127. Co-defendant Brinkley indicated that he was also selling drugs and that he was competing for business. Id. He had argued with Naz, and relayed that he was arrogant because he didn't believed that guys from Pottstown are tough like in Philadelphia. Id. at 129. Co-defendant Brinkley specifically stated, he "ain't going to let old dudes eating while he's starving." Id. at 127. Co-defendant Brinkley talked about the habeas corpus hearing and about Jamar Baird. Id.

---

[8]     Williams testified that the term "strap" is synonymous with "gun." (N.T., Trial by Jury – Day 6 of 8, 1/11/22, p. 125).

24

Co-defendant Brinkley was upset that he was going to testify against him when he was supposed to be part of his gang, BGB. Id. at 130.

Detective Heather Long was working in March of 2019 with Pottstown Police Department as a detective. Id. at 235 – 236. On March 30, 2019, Detective Long was called to assist with the investigation, to help conduct interviews on the night of the murder. Id. at 236. Days later she canvassed the area and later helped with cell phones. Id. During her time in Pottstown, she came into contact with individuals who had information about BGB. Id. at 236 – 237. She obtained information about BGB through numerous interviews, talking to community members, review of cell phone downloads in other investigations, reviewing social media, Instagram, Facebook, and Snapchat. Id. at 237.

Detective Long testified that she is familiar with BGB. Id. at 279. The detective explained that on July 6, 2017, Jordan Bud Scott was murdered in Norristown. Id. Speaking with people in the community, reviewing some of the videos, social media, various prior investigations, she is aware of people who associate with BGB. Id. at 280. In particular, the detective described graffiti in Pottstown as it relates to BGB at Chestnut and North Washington Streets, where a tractor trailer had numerous spray painting tags on it, Fly High Bud, RIP Bud, LL23, Long Live Bud Savage, Free the Gang. Id. at 281 – 282. Detective Long knows that Jamar Baird, has a BGB tattoo on his neck. Id. at 282. Jamir Mitchell has a BGB tattoo on the back side of his hand. Id. She also knows that Lee, co-defendant Brinkley, Tyshaun Harvey, Kelvin Harris,

25

Jarid Majors, Ryan Fields, Nahmer Baird, Makael Bevins, Ahnile Fountain, and Elijah Davis are affiliated with BGB. Id. at 282 – 283. As to co-defendant Goins, the detective testified that he is associated with several people in BGB, and that they went to Pottstown High School together and hung out under the title BFL, Brother for Life. Id. at 283 – 284.

Detective Long reviewed self-produced rap videos she came across on YouTube. Id. She came across these videos in reviewing social media, and it was brought to her attention by another officer in Pottstown, at which point she started additional intelligence gathering on the individuals and the gang in general in late 2018. Id. at 284 – 285. The detective testified that the video "Don't Understand" has references to BGB, and that individuals associated with BGB appear in the videos. Id. at 286. She testified that it was recorded sometime between July 2017 and May 2018. Id. at 287.

Detective Long testified that portions of the video are filmed at Chestnut and North Washington Street in Pottstown, that area with the trailer that had the BGB graffiti, another portion that is filmed inside 7 Beech Street, the other half of the 206 Manatawny complex. Id. at 292 – 293. The tractor trailer location is also significant because the day prior to Jordan Scott's murder, he was involved in a shooting at that location. Id. at 293.

Detective Long further testified using still photographs taken from the rap video. Id. at 294. The first picture depicted the start of the video with a picture of Jordan Scott. Id. at 294 – 295. In the background is the trailer with the BGB graffiti. Id. at 295. Lee and Jamir Mitchell were also depicted. Id. The

26

main rap artists in the video were Lee and Jamir Mitchell. Id. In another still frame from the video was Steven Mitchell, who was murdered in 2014. Id. That was also Lee's Instagram profile picture. Id. at 295 – 296. Another still image depicted Alexander Dot Scott, older half-brother of Jordan Scott, and Ryan Rizz Fields. Id. at 296. The next still image was of the participants rapping. Id. Present were Lee, co-defendant Brinkley, Robert McCoy, Jamir Mitchell, and Charles Harris. Id. They were all wearing Medellin Materials clothing. Id. at 297. Another image shows Lee and co-defendant Brinkley shaking hands. Id.

An additional video, "Savage," featured individuals that were rapping including, co-defendant Brinkley, Jamar Baird, and Jamir Mitchell. Id. at 298 - 299. The detective identified an image of a medallion with a picture of Jordan Scott. Id. at 300. Another image was of co-defendant Brinkley holding a handgun. Id. at 301.

Lieutenant Richard was recalled to testify. He testified about the Instagram account associated with Lee, with the handle Str8_swizz. Id. at 329. The lieutenant reviewed communications between account Str8_swizz and d_fastlife. Id. at 331. D_fastlife was associated with co-defendant Goins. Id. The lieutenant put together a Powerpoint in regard to the Instagram information he obtained in this case. Id. at 333. On April 1, 2019 at 10:03 p.m., Goins says to Lee, "Be ready in the a.m. so that jawn slide back." Id. Lee responds at 10:04 p.m., "Okay, D." Lieutenant Richard noted that the significance of April 1, 2019, is that it is the night before they returned the black rented minivan. Id. at 333 – 334. It was returned on April 2nd at 9:46 a.m. Id. at 334. Further,

27

communications between Lee's account and co-defendant Goins' account, show they were in close contact in days and weeks after the murder. Id. at 335 – 337.

Lieutenant Richard also obtained co-defendant Brinkley's Instagram account records. Id. at 338. Brinkley went by the username, _dreaaaddo. Id. Between the dates of March 28th and April 14th of 2019, he obtained conversations between Lee and co-defendant Brinkley Id. at 339. The name of Brinkley's account was LongLiveBudSavage. Id. The lieutenant detailed at trial these various communications. Id. at 339 – 341.

Further, Lieutenant Richard testified that after the search warrant was executed on 206 Manatawny Street, Apartment C2 on April 3, 2019, at 11:00 a.m., there were communications between Lee to Instagram username Elijah.thee.prophet that same day starting at 11:43 a.m. Id. at 342 – 344. From Elijah Newman to Lee, "The boys just raided C2 down here, bro. Just want you to know." He followed with a message, "Delete these messages." Id. at 343. Then there were two video calls from Lee to Elijah Newman, followed by a message from Lee to Elijah Newman that said, "Are they still there," followed by a message from Elijah Newman, "Yeah, inside." Id. Lee to Elijah Newman, "A lot. Did they bring anyone out?" Id. A message from Lee to Elijah Newman, "Okay, Let me know if you see dem bring d-t-u-f-f out." Id. In one of Elijah Newman's messages he replied to Lee stating, "They found stuff. I think they came out with clear bags with shit." "They left, but they brought shit out." Id. Lee replied, "A lot of them, question mark." Id. Elijah Newman said, "Couple. I

28

couldn't see that good." Id. Lee to Elijah Newman, "Any more still there." "Is that door wide open?" Elijah Newman replied, "Thye left ND. IDK. I ain't go in." Id.

The lieutenant details Instagram additional communications between Lee and Jarid Majors and Javier Rodriguez, indicated that they knew law enforcement was closing in. Id. at 344.

Further, Lieutenant Richard testified as to two photographs of Lee and Bianca Kelly, in which Lee is wearing a black jacket with the same distinctive features as the one found near the murder scene. Id. at 350 – 352.

The lieutenant testified as to additional photographs, one depicting Samir Gould-Roberts, a friend of Lee. Id. at 355. In that post it says, "My youngin could have been a rat, by he stayed 100, so I'ma 100 back. Free my dawg." Id. at 356. This was from March 25, 2019. Another photograph is of a motorcycle inside a minivan, a small portion of someone's face with the caption, "Who bringing the bikes out?" Id. This was posted on Lee's account on March 30, 2019 at 1:28 p.m. Id. A photograph was posted on March 30, 2019 at 6:42 p.m., with the caption, "Money, power, respect, yeah, I earned that."

Lieutenant Richard also obtained photographs from co-defendant Brinkley's Instagram account. Id. at 363. Underneath his profile picture, he has tag lines that read, "Long Live Bud Savage," "loyalty over royalty," and "Clip up or get clipped, pussy." Id. at 365. There was a meme posted to co-defendant Brinkley's account on April 10, 2019 that stated, "Never turn ya back on ppl that had yours 100." Id. at 365 – 366. The same meme was posted on April 14,

29

2019, and stated, "Real Street" - - N word - - "ain't never going to fold, follow that code, only thing I stand by." Id. at 366 - 367. Another photograph depicted co-defendant Brinkley, Jamar Baird, Kelvin Harris, Jarid Majors, and Tyshaun Harvey. Id. at 367. This was posted on March 30, 2019, at 12:00 p.m. Id. A selfie of co-defendant Brinkley was posted wearing the medallion. Id. at 368. Next, co-defendant Brinkley's account depicted two sayings on March 5, 2019 which said, "If you ain't out here getting yo money and yo straps up, yo priorities fucked up." "And don't repost this shit bc y'all MFS stay cappin." Id. at 368 – 369. Later, on April 29, 2019, co-defendant Brinkley's Instagram account read, "Loyalty first, money second, N word, don't fuck up the motto 100." Id. at 369 – 370. Next, was a photograph, posted on April 14, 2019, of co-defendant Brinkley, Makael Bevins, and Tyshaun Harvey inside of 206 Manatawny, Apartment C2, with the caption, "free da gang!!!!" Id. at 370 - 371.

On the seventh day of trial, the Commonwealth presented the expert testimony of Lieutenant Erick Echevarria. (N.T., Trial by Jury – Day 7 of 8, 1/12/22, p. 47). Lieutenant Echevarria worked for the Montgomery County Detective Bureau, currently the supervisor of the violent crime unit. Id. at 48. The lieutenant was accepted as an expert in gang structure and organization, drug trafficking, and jargon. Id. at 54 – 55.

Lieutenant Echevarria first described what makes a group of affiliated individuals a gang. Id. at 62 – 63. By reviewing social media, music videos, information from various police departments and correctional facilities, he and his investigators look for common bonds. Id. at 63. He explained that in

30

Montgomery County there are primarily two locations with gang activity, Norristown and Pottstown, with Pottstown having more of a history of gang activity. Id. at 63 – 64. In general when a gang forms, members self-profess, they post, and they tag up until law enforcement gets involved. Then the members stop in order to distance themselves quickly from the gang. Id. at 64. The lieutenant testified that not every group of individuals that he has investigated, including numerous organizations involved in drug trafficking and other crimes, are gangs. Id. at 64. One of the things that sets a group of people apart from a gang, especially in Pottstown and Norristown, is that they attach that name to the criminal activity they're doing and expressing that through music videos, posting, tagging, and through word of mouth, and clothing. Id. at 65. This is done to bolster their image and spread fear. Id.

Lieutenant Echevarria became familiar with gang and drug jargon through his undercover work, i.e., wiretaps, reviewing social media, and phone downloads. Id. He has gathered gang intelligence to identify gang members and gang activity through local police departments, county and state level correctional facilities, interviewing informants, newly released prison gang members, music videos, and social media. Id. at 65 – 66.

Lieutenant Echevarria explained the gang activity in Pottstown, both predecessor gangs and BGB. Starting in 2015, his unit was tasked to investigate violence that was occurring within the Borough of Pottstown. Id. What he learned was how gangs evolve, where members stay the same or split up, but the name changes. Id. at 67. He explained that Pottstown gang activity

31

started out as Brothers for Life ("BFL"). Id. at 67. In fact, co-defendant Lee has a BFL tattoo. Id. Co-defendant Goins and Jarid Majors were members of that gang. Id. BFL became Brothers From Another ("BFA"). Id. at 67. As his unit was investigating this gang activity, people were either BFA or Straight Cash Money Gang, ("SCMG"). Id. SCMG was represented through T-shirts and rap videos. Id. There was an investigation in these gangs and arrests were made. Thereafter, there was a void in regard to gang activity in Pottstown, until law enforcement began to hear about 206 Manatawny Street. Id. Initially, it was believed that it was related to SCMG. Then in 2017, there was an influx in shootings in Pottstown when Jordan Scott was murdered. Id. Lieutenant Echevarria put his unit on alert, he contacted the correctional facilities and other agencies that this could be a triggering event for future gang activity. Id. at 68. After that, he explained the moniker BGB came. Id.

Lieutenant Echevarria explained that a home-grown gangs or corner gangs are informal groups of people that are from a neighborhood. Id. They can either be for money or for turf, and they're joined together. Id. These home-grown gangs copy bigger gangs such as the Bloods, Crips, the Latin Kings and some of their ideologies. Id. In Montgomery County there is limited influence from national gangs, and much more home-grown street gangs. Id. The lieutenant further explained that what can happen with a home-grown gang is that the name can change and mutate, and if they find a reason to justify a name change and to be more aggressive and violent, they will do so. Id. at 68 – 69. Examples of events that could justify a name change could be a

32

split from the founding member who created the name or law enforcement involvement. Id. at 69. For instance the SCMG, which was everywhere until there was an extensive investigation, and now the lieutenant testified that he rarely sees a mention of that gang. Id. Another triggering event for a name change could be a death or a murder. Id. Alexander Scott was an active member of SCMG, who is now in state prison for his gang activity, his younger brother was Jordan Scott. Id. That is why when Jordan Scott was murdered he put the local police departments, correctional facilities, and his unit on alert. Id.

More specifically as to BGB, Lieutenant Echevarria explained how individuals are identified as being associated with BGB. A majority of the people associated with BGB had BGB hashtags[9], some sort of connection to BGB, or they were in videos in front of graffiti. Id. at 69 – 70. Also, even just going down a street in Pottstown, some people would yell "BGB." Id. at 70. The lieutenant searched for the hashtag BGB which turned up a lot of profiles and messages from the Pottstown area. Id. He further explained that individuals who are not in the gang might use the hashtag just to instill fear, because you are either with them or against them. Id. at 72 – 73. In his review of materials in this case that apply to BGB, there are other references and hashtags. Id. at

---

[9] It is a way to promote things on social media and the internet, legitimate and illegitimate. (N.T., Trial by Jury – Day 6 of 8, 1/12/22, p. 70, 71). Lieutenant Echevarria explained that it is the more modern equivalent of more traditional ways of promoting things such as graffiti. Id. So one way to promote your gang and your membership is to put a hashtag with that on social media. Id.

33

73. There were references to: Michael Jordan because of Jordan Scott's name, Long live Bud Savage, Bud Savage. Id.

In reviewing Lee's Instagram records, Lieutenant Echevarria was able to determine that he was involved in drug trafficking. Id. For instance, Lee's Instagram account posts stated, "the food is in" which he interpreted to mean that he was waiting for an arrival of illegal drugs. Id. at 75. He observed that "food" is code for heroin or fentanyl. Id. There were also references to drug trafficking in the rap videos that were reviewed. Id. at 75 – 76. Lieutenant Echevarria was able to determine that Lee was in a position of prestige in BGB. Id. at 76. To hold a position of prestige in a gang like this, the older members pass down the ideologies of the gang, such as they do not cooperate, loyalty, gang mantras, the way to live, how to drug traffic and other various illegal activities the gang is involved with. Id. at 77.

The lieutenant reviewed and testified to several of Lee's Instagram posts, interpreting jargon. Id. He interpreted this jargon to reflect gang mentality, such as not to speak to law enforcement about the illegal activities. Id. at 78 - 79. As to co-defendant Brinkley's Instagram account named Long Live Bud Savage, referring to Jordan Scott, along with his posts, Lieutenant Echevarria determined that he is affiliated with BGB. Id. at 79, 81. The lieutenant interpreted many of these posts for the jury that exemplify gang mentality and ethos, such as "loyalty over royalty," meaning that you're loyal to the code, to the gang; "clip or get clipped," to the lieutenant meant that co-defendant was armed; "never turn ya back on ppl that had yours 100,"

34

meaning that if someone was loyal to you, then you are loyal to them. Id. at 80 - 82. Another post, "Loyalty first, money second," - - N word - - "Don't fuck up da motto 100," means loyalty to your gang, to your neighborhood, to your group, and then to make money is the next priority; so first is loyalty and second is to make money. Id. at 84. Another post, "free the gang," the lieutenant explained that this term comes up almost every time a group - - one of the group of people are incarcerated. Id.

Next, Lieutenant Echevarria discussed the significance of rap videos. Id. at 85. It was the lieutenant's expert opinion that BGB was not just a music group. Id. at 86. It is significant that the individuals that are depicted in the BGB videos are appearing in videos branded by BGB. Id. at 86 – 87. It spreads fear, it's telling the community that this is BGB. Id. at 86. Both of the videos talk about BGB itself. Id. at 87.

Lieutenant Echevarria decoded for the jury portions of the lyrics of the rap video "They Don't Understand." Id. at 89.

> It's Bud Gang Bitch. You don't understand. Nah, they
> don't understand. How they killed my man. That shit
> wasn't in the plan. You know me, off the wake up, I'm
> trying to make a band. What you need? I got grams of
> that white and the tan.

Id. at 90. He explained that they don't understand the death of Bud Scott and that the "wake-up" is when they wake up to try to make a band, a street term for a thousand dollars. Id. at 91. "White and tan" denotes cocaine and fentanyl. Id. He further explained that "[y]ou ain't a sucker free, homie. You took the stand, rat" is professing they are still loyal to the code, that they're still with

35

the crew, with the gang. A "sucker" would be someone who is trying to be something they are not. Id. at 91 – 92. "You took the stand, rat," refers to someone who cooperated with law enforcement. Id. at 92.

> And the streets reach deep - - N word - - ain't no
> turnin' back, couple - - N words - - locked down that
> could turn into rants. I ain't stressing, but he tired
> and I'm wearing all black. Had to learn in reality I can't
> get Bud back. Every time I see an opp, it's going to be
> a blood bath. If you ain't tryin' to die, then you better
> fall back. I ain't aimin' fir the chest. I aim right at your
> head. If the cops ask me, man, I never saw that. No if
> the cops ask me, man, I never say that.

Id. The significance of "[t]he streets reach deep," refers to the fact that the arm of the streets is long and that you can be retaliated. Id. at 92 – 93. "Ain't no turnin' back," denotes that there's no turning back from that lifestyle. Id. at 93. It could also mean that once you cooperate that you're not permitted back into the group. "Couple" - - N word - - "locked down" expresses a concern that when another individual that knows your illegal activity, is incarcerated by law enforcement, that there's the risk of cooperation and that they are concerned about their cooperation. Id. "I ain't stressing, but he tired, I'm wearin' all black," is that they put on the clothes to conceal their identity, dark clothes at night. Id. "I had to learn the reality I can't get Bud back," that's he's not coming back from the dead. Id. at 93 – 94. "[E]very time I see an opp, it's going to be a blood bath," "[o]pp" means opposition, someone that is against the gang. Id. at 94. The lieutenant testified that it is his opinion that if they see someone on the other side or someone they perceive as an enemy, that there will be a blood bath, that there'd be some sort of violence. Id.

36

Upon questioning of what could cause someone to be perceived as an enemy, the lieutenant explained that it could stem from a murder of a member. Id. Once it starts, any little thing triggers the violence. Id. "If you ain't tryin' to die, then you better fall back," means don't oppose us. Id. "If you ain't aimin' for the chest, I aim right at your head," means they are going to shoot you in the head. Id. "If the cops ask me, man, I never saw that. Nah, the cops ask me, I never saw that," warns not to cooperate with law enforcement, if you are interviewed by police, you didn't see anything. Id.

> In this game, you gotta cheat to make it out. Yep. I
> feed 'em in the streets by servin' food out the house.
> Pedro. I come with straight cash. I don't need no
> handouts. Cash. I started my own label, man, Medellin
> the brand now. From the streets.

Id. at 96. The lieutenant interpreted this to mean, that the "game" is life, and to get out of whatever predicament you are in, you have to do some sort of cheating. That cheating could be drug trafficking, it could some other crime, but cheating as in not normal work. Id. "Feed 'em" refers to heroin and fentanyl, and here it means illegal drugs. Id. "I come with straight cash, I don't need no handouts," the lieutenant believed it to be a reference to Lee's prior membership in Straight Cash Money Gang. Id. at 96 – 97. Co-defendant Lee is also referring to his clothing label that he started, Medellin. Id. at 97.

Lieutenant Echevarria opined that investigators did see an increase of Medellin T-shirts and wear in Pottstown. Id. Lee was the owner of that T-shirt company. He further explained that Medellin in from Columbia, one of the logos that it has is similar to the coca-cola logo, Pablo Escobar is

37

sometimes referred to as the goat of drug-trafficking, the greatest of all time, and it's from Medellin, Columbia. Id. at 97 – 98. In one of the videos there is an acted-out drug transfer. Id. at 98. There's another one of the T-shirts with weight measurements on the back, and those measurements refer to amounts of drugs. That's on the back of Lee's T-shirt. Id. So in the video all the BGB guys are wearing Medellin T-shirts, and so Medellin T-shirts become associated with BGB so that they become interchangeable. Id. The lieutenant testified that since this murder and ensuing investigation, he hasn't seen Medellin clothing anymore. Id.

Next, the lieutenant testified regarding the rap video, "Savage." He explained that "We trappin," means selling drugs. Id. at 100. "None of my" – N word – "is lackin, we just pop out of the house, we blastin';" "[n]one of are lackin" refers to always being armed. Id. "Glizzy on me ain't lacking." Id. at 101. This refers to a firearm or specifically to a Glock, and the expression means that I have a gun on me. Id. "Cops come" - - N - - "run disappear like magic," according to the lieutenant is a gang mantra not to cooperate with police. If the police come, go, leave. Id. at 101 – 102. "All night we stackin'". "Stacking" means stacking money. Id. at 102. "Hoodie up, clips full, man's gone, shit tragic, fill 'em up, pull off, roll up, we laughin', VIP Little Bud." "Hoodie up" means to conceal yourself. Id. "Clip's full," the magazine is full. "Man's gone" could be the intended victim, or they could be referencing Jordan Scott Id. at 102 – 103. "Shit tragic" still talking about Jordan Scott. "Fill 'em up, "which

would be the intended victim to full them with bullets." Id. at 103. And "pull off, roll up, we laughin'," after the shooting it's funny. Id.

Next, the Commonwealth asked Lieutenant Echevarria about 206 Manatawny Street, Apartment C2 location, and what significance it has to BGB. Id. He responded that that location was previously identified as a SCMG location, and then it became a location of interest to law enforcement prior to the murder of Jordan Scott and after his murder. Id. The lieutenant reviewed several photographs of the interior of Apartment C2, and stated that they indicate that that location is a trap house. Id. at 104, 105 - 106. He explained that a trap house customarily does not have anyone living there so it can't be tied to any one person, and it's used for trafficking. It's known to customers. Id. His opinion was based on the fact that the photographs depicted limited furniture, and other indicators that it was used for selling drugs. Id. at 106.

The Commonwealth recalled Lieutenant Richard as its final witness. Through Lieutenant Richard's testimony, co-defendant Brinkley's July 10, 2019 grand jury testimony was introduced and read into the record. Id. at 191 – 211. Arrest warrants were issued on July 25, 2019. Id. at 225.

At the conclusion of the trial on January 13, 2022, Lee was found guilty of first-degree murder and conspiracy. He proceeded directly to sentencing, at which time a life term imprisonment was imposed.

An untimely post-sentence motion was filed on January 25, 2022. The tenth day for filing as provided for by Pa.R.Crim.P. 720, fell on Sunday, January 23, 2022; therefore, Lee had until Monday, January 24, 2022 to file a

39

timely post-sentence motion. Therein, he challenged the weight and sufficiency of the evidence. However, a timely appeal was filed within 30 days from the judgment of sentence on February 11, 2022, making this a timely appeal.

## ISSUES

This Court issued an order directing Brinkley to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). An extension of time to file a 1925(b) statement was granted, and on May 16, 2022, he submitting the following issues for appellate review:

1. The verdict was against the weight of the evidence in that descriptions of the likely shooter given by various eyewitnesses Elias Scipio, Comese Robinson, and Robert Garcia at trial were all conflicting with each other and each of them were inconsistent with the defendant's physical appearance and what he was alleged to have been wearing the night of the shooting. Further, the jacket, the only physical evidence from the vicinity of the crime scene purportedly linking the defendant to the scene, was not recovered until several hours after the shooting and in an area outside of the secured crime scene.

2. The evidence was insufficient to find the defendant guilty of first-degree murder or conspiracy to commit that offense, where the evidence was insufficient to establish the identity of the shooter and was further insufficient to show that the hooter acted with a specific intent to kill pursuant to a premeditated and deliberate plan.

3. The trial court erred in admitting evidence and testimony regarding the supposed involvement of defendant and his co-defendants in a gang where, under the facts and circumstances of this case, the purported probative value of the gang-related evidence and testimony was outweighed by the

40

unfair prejudice to the defendant. Relatedly, and for the same reasons, the trial court erred in permitting Detective Erick Echevarria, to testify as an expert in the area of gang structure and organization, drug trafficking, and jargon.

4. The trial court erred in permitting the Commonwealth to introduce inflammatory social media videos and photographs of defendant, his co-defendants with rap videos, photographs and messages pertaining to violence, guns, and supposed gang activity in that the purported probative value of such prior act evidence was outweighed by the unfair prejudice to the defendant.

5. The trial court erred in permitting the Commonwealth to introduce the Grand Jury testimony of Jamar Baird, which implicated defendant and his co-defendants in the crime, where Mr. Baird took the witness stand at trial, but indicated that he did not remember in response to most questions put to him.

6. The trial court erred in admitting the supposed confession of defendant's co-defendant Kyshan Brinkley through the trial testimony of Elijah Williams because Brinkley was not available to be cross-examined by defendant with regard to his supposed confession.

See, Statement of Matters Complained of on Appeal, filed 5/16/22.

## DISCUSSION

I.   Weight of the Evidence

First on appeal, Lee asserts that the verdict was against the weight of the evidence. Specifically, he calls into question the alleged conflicting descriptions of the shooter provided by Commonwealth witnesses Elias Scipio,

41

Comese Robinson, and Robert Garcia. Lee argues that that not only were they all conflicting with each other, but also, each was inconsistent with the defendant's physical appearance and what he was alleged to have been wearing the night of the shooting. Lee further argues that the jacket, which was the only physical evidence from the vicinity of the crime scene purportedly linking him to the scene, was not recovered until several hours after the shooting and in an area outside of the secured crime scene. However, this issue is waived because it was not properly preserved.

The Pennsylvania Rules of Criminal Procedure require that a "claim that the verdict is against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607. A challenge to the weight of the evidence "must be presented to the trial court while it exercises jurisdiction over the matter because appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." Commonwealth v. Burkett, 830 A.2d 1034, 1037 (Pa. Super. 2003) (internal quotation marks and citation omitted). An untimely post-sentence motion does not preserve issues for appeal. Commonwealth v. Wrecks, 931 A.2d 717, 719 (Pa.Super. 2007).

In this case, Lee had ten days to file a timely post-sentence motion. The tenth day in this case fell on Sunday, January 23, 2022; thereby, making Monday, January 24, 2022 the last operative day on which to file a timely post-

42

sentence motion. Lee's motion was not filed until Tuesday, January 25, 2022, making it untimely. Therefore, the untimely post-sentence motion did not preserve his weight claim on appeal.

## II. Sufficiency of the Evidence

Next, Lee claims that the evidence was insufficient to support his convictions of first-degree murder or conspiracy to commit first-degree murder, where the evidence was insufficient to establish the identity of the shooter and was further insufficient to show that the shooter acted with a specific intent to kill pursuant to a premeditated and deliberated plan.

Courts apply the following standard of review to sufficiency claims which arise in the context of a motion for judgment of acquittal:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. [ ]. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. [ ]. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted). ). Additionally, our appellate court may not reweigh the evidence or substitute its own judgment for that of the fact finder. Commonwealth v. Hartzell, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely

43

circumstantial as long as it links the accused to the crime beyond a reasonable doubt. Commonwealth v. Moreno, 14 A.3d 133, 136 (Pa. Super. 2011).

First degree murder is a criminal homicide committed by an "intentional killing." 18 Pa.C.S.A. § 2502(a). "Intentional killing" is defined as "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d). The elements of first-degree murder are: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. Commonwealth v. Houser, 18 A.3d 1128, 1133 (Pa. 2011). Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death. The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Commonwealth v. Jordan, 65 A.3d 318, 323 (Pa. 2013) (quotation marks and citations omitted).

In order to convict a defendant of criminal conspiracy, the Commonwealth must establish that: "(1) [he] entered into an agreement to commit or aid in the commission of a crime; (2) he shared the criminal intent with that other person; and (3) an overt act was committed in furtherance of the conspiracy." Commonwealth v. Knox, 50 A.3d 749, 755 (Pa. Super. 2012) (citation omitted). "This overt act need not be committed by the defendant; it need only be committed by a co-conspirator." Id.

44

Our Pennsylvania Superior Court has further explained:

As conspiracy by its nature is often difficult to prove due to the absence of direct evidence, cases examining the sufficiency of the evidence often look to the conduct of the parties and the circumstances surrounding their conduct which may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt.

Among the circumstances that which are relevant, but not sufficient by themselves, to prove a [criminal] confederation are: (1) an association between alleged coconspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accursed to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.
Other circumstances which are relevant include post-crime conduct, such as flight, because it tends to establish consciousness of guilt. When combined with other direct or circumstantial evidence, that conduct may provide sufficient evidence to establish a conspiracy.

Jordan, 212 A.3d at 97 (quotation marks and citations omitted).

Here on appeal it is argued that the evidence was insufficient to prove the identity of the shooter as Lee and was further insufficient to show that the shooter acted with a specific intent to kill pursuant to a premeditated and deliberated plan. However, this issue is without merit. There was sufficient evidence to support Lee's convictions. Specifically, it was proven circumstantially that Lee was the shooter.

Lee was established as the shooter in the conspiracy. The shooter was captured on video surveillance at the murder scene, in which the shooter

45

is wearing a black jacket. A black jacket was recovered from the trashcan outside of 47 Beech Street, a short distance from the murder scene, and it was found in the same area as the tenth fired shell casing. DNA testing of various parts of the jacket, such as the zippers and snaps, revealed that Lee's DNA was on the jacket. Lee was also seen in several photographs wearing that same jacket, which had distinctive features. Further, eyewitness identification saw a male in dark clothing the area of the murder right after each witness independently indicated they heard gunshots fired. With all this evidence the jury had sufficient evidence in which to determine that Lee was the actual shooter.

In addition, "[t]he specific intent to kill may be inferred where ... the accused uses a deadly weapon on a vital part of the victim's body." Commonwealth v. Cash, 137 A.3d 1262, 1269 (Pa. 2016). Here, the deputy coroner testified that the victim was shot in the neck and the chest. Therefore, the Commonwealth showed that Lee used a deadly weapon on a vital part of the victim's body. This evidence was sufficient to prove Lee acted with the specific intent to kill required to support a conviction for first-degree murder, had a specific intent to kill. See, Commonwealth v. Briggs, 12 A.3d 291, 306 (Pa. 2011); Commonwealth v. Sanchez, 36 A.3d 24, 37 (Pa. 2011).

III.    Gang-Related Evidence

Lee, in his third and fourth issues on appeal he challenges the admission of gang-related evidence. Specifically in issue number three, Lee contends that the this Court erred in admitting evidence and testimony

46

regarding his supposed involvement and his co-defendants in a gang where, under the facts and circumstances of this case, the purported probative value of the gang-related evidence and testimony outweighed by the unfair prejudice to the defendant. Relatedly, and for the same reasons, the trial court erred in permitting Detective Erick Echevarria to testify as an expert in the area of gang structure and organization, drug trafficking, and jargon. As to issue number four, he claims that this Court erred in permitting the Commonwealth to introduce inflammatory social media videos and photographs of defendant, his co-defendants with rap videos, photographs and messages pertaining to violence, guns, and supposed gang activity in that the purported probative value of such prior act evidence was outweighed by the unfair prejudice.

The Commonwealth's theory of this case was that the co-defendants conspired to murder the victim, who was a rival drug dealer to the BGB gang. As evidence in support of this theory, the Commonwealth sought to introduce evidence that Lee and co-defendant Brinkley were members of a home-grown Pottstown gang, BGB, through witness testimony, rap videos and lyrics, social media posts, and through gang expert testimony of Lieutenant Erick Echevarria. The Commonwealth offered Lieutenant Echevarria's testimony to decode the various drug jargon contained in the rap videos and lyrics, and would testify as to how gangs operate, and gang related ethos of loyalty and respect. This gang related evidence was relevant to show the relationship among the parties, which goes to conspiracy. In addition, this gang related evidence was relevant to show the motive to kill the victim, namely that

47

the victim was a rival drug dealer. To this end, Lieutenant Echevarria would provide expert testimony as to gang ethos of loyalty and the desire to have control of the streets. This gang related evidence of affiliation with BGB; BGB rap videos; BGB rap lyrics; and Instagram account evidence would mainly come in as evidence through the expert testimony of Lieutenant Echevarria and from the testimony of Detective Heather Long.

At the first Pre-Trial Motion Hearing on June 23, 2021, the Commonwealth stated that Lieutenant Echevarria was being offered for his background information on BGB throughout his time as a county detective as well as an expert in gangs generally. (N.T., Pre-Trial Motion, 6/23/21, p. 12). The Commonwealth represented that Lieutenant Echevarria would be able to provide information about gangs generally as well as knowledge specific to BGB. Id. at 18. The Commonwealth suggested that the jury would be aided by his testimony regard the background and history of BGB, how groups like that are formed, how they rely on each other, how they function, how they are structured, use a common home base at 206 Manatawny Street, Apartment C-2, and how these groups value and depend on the concept of loyalty and respect. Id. at 17. The Commonwealth asserted that this evidence was relevant to show an association which goes to the existence of a conspiracy. Id. at 14 – 15. Additionally, the Commonwealth argued that expert testimony was critical to provide understanding as to motive and without this testimony the motive would not be clear. Id. at 15, 33. Under the Commonwealth's theory, BGB gang members want the victim gone, they wanted a strong hold in the Pottstown

48

area in terms of street credibility as well as the drug and gun trade. Id. at 33. All this information would come in through the expert testimony, and that it is up to the jury to give weight to this testimony or not.

Further argument was conducted at a Pre-Trial Motions Hearing on November 29, 2021. At that time the Commonwealth argued that the expert testimony would tie all the circumstantial pieces of evidence together to show that even the slightest show of disrespect perceived or real could cause gang members to express that loyalty to one another, which is what was a motive for the murder. (N.T., Pre-Trial Motions, 11/29/21, p. 8). Witnesses would establish the victim was a drug dealer, that everyone knew he was a drug dealer, and that these co-defendants knew he was a drug dealer and wanted to take him out. Id. at 7. Through the testimony of Elijah Williams, there would be significant evidence regarding the motive for the murder, i.e., that these co-defendants were frustrated that individuals are coming from Philadelphia to Pottstown to sell drugs, they didn't get the respect in Pottstown they deserved, and that is why they wanted to kill the victim; and the testimony of Lieutenant Echevarria who would review BGB affiliation, rap videos and lyrics, social media posts, drug jargon would put the whole picture together. Id. at 7 – 8. According to the Commonwealth, every piece of the puzzle would come together through this expert testimony. Id. at 8. He would be called to testify of how a gang operates and how these co-defendants' mentality operated as part of a gang and to contribute to the motive in this case. Id. at 51.

49

After considerable deliberation, this Court issued orders denying the co-defendants' motions in *limine*, and granting the admission of evidence on December 20, 2021.

The denial of a motion in *limine*, granting the admission of evidence is reviewed by our appellate courts for an abuse of discretion. Commonwealth v. Mangel, 181 A.3d 1154, 1158 (Pa. Super. 2018).

It is well settled that the "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." Commonwealth v. Tyson, 119 A.3d 353, 357 (Pa.Super. 2015) (*en banc*) (internal citation and quotation marks omitted); see also Commonwealth v. Hoover, 107 A.3d 723, 729 (Pa. 2014) (noting that an appellate court applies an evidentiary abuse of discretion standard when reviewing the denial of a motion in *limine*). "Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." Commonwealth v. Huggins, 68 A.3d 962, 966 (Pa.Super. 2013) (internal citations and quotation marks omitted).

Relevance is the threshold for admissibility of evidence. Pennsylvania Rule of Evidence 401 provides that evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Pa.R.E. 401. All relevant evidence is admissible,

50

except as otherwise provided by law. Evidence that is not relevant is not admissible. Pa.R.E. 402. The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.' Pa.R.E. 403.

Rule 404(b) prohibits evidence of a defendant's prior bad acts "to prove a person's character" or demonstrate "that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, prior bad acts evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "In a criminal case, this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Id. "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."

A. Gang Affiliation

The Commonwealth sought to introduce evidence of gang affiliation. The Commonwealth claimed that there was only one shooter, and the remaining co-defendants assisted in committing the murder. (N.T., Pre-Trial Motions, 6/23/21, p. 45). It would be their affiliation through the gang that would be relevant to show this conspiracy. Id. In addition, according to the Commonwealth, this gang association explained the motive of the murder. Id. at 13, 14 – 15.

51

It is well-established that evidence of a defendant's gang activity is admissible to establish a conspiracy. See Commonwealth v. Gwaltney, 442 A.2d 236, 241 (Pa. 1982) ("evidence of the gang activity is highly probative of whether a conspiracy existed"); see also, Commonwealth v. Flamer, 53 A.3d 82, 89 (Pa.Super. 2012) (rap lyrics should have been admitted where lyrics about people "keeping their mouths shut," sending friends to kill for him, and "popping shells" in people that "run their mouth" had a tendency to show a conspiratorial agreement). In addition, the gang activity evidence was relevant to establish a motive for the murder. This evidence when pieced together with other testimony and evidence, including the drug expert testimony, presented by the Commonwealth established that co-defendants viewed the victim as a rival drug dealer. See, Commonwealth v. Ramos, 532 A.2d 22, 23-24 (Pa. Super. 1987) (properly admitting evidence of gang activity and drug dealing to explain motive and relationship).

As noted earlier, gang affiliation evidence was comprised of several components such as the rap videos, rap lyrics, social media accounts, which was all testified to, explained, and tied together by Lieutenant Echevarria's expert testimony. It also included the testimony of Detective Long, and questioning of Jamar Baird and Jarid Majors. In general, the evidence of gang affiliation was properly admitted and relevant to show association among the co-defendants to establish conspiracy and motive for the murder. Evidence of gang affiliation and gang ethos as testified to by Lieutenant Echevarria was relevant to show that these co-defendants had the motive,

52

intent, and plan to conspire in the murder. Therefore, this gang affiliation evidence was properly admitted at trial.

## B. Rap Videos and Rap Lyrics

The Commonwealth sought to introduce the rap videos and lyrics in order to establish conspiracy and motive. The Commonwealth argued that the rap videos demonstrate gang activity and association, which went to the conspiracy to commit murder. (N.T., Pre-Trial Motions, 6/23/21, p. 12 - 13). More specifically, the Commonwealth stated that the rap videos are associated with the BGB, with numerous BGB tags and graffiti, and are filmed in locations significant to BGB, including 206 Mantawny Street. Id. at 16. The videos and lyrics contained references to always carrying firearms and specific references to not cooperating with police. Id. at 56. Finally, the Commonwealth suggested that Lieutenant Echevarria would testify that only close associates would appear in these sorts of videos. Id. at 43. As to motive, the rap videos and lyrics contain an emphasis on the importance of drug dealing and making money, with many drug dealing references as explained through Lieutenant Echevarria's interpretation of drug dealing jargon and drug references. Id. at 43. On December 20, 2021, an order was issued denying the motion in *limine* to exclude the rap videos and lyrics.

The rap videos and lyrics were properly admitted to show that there was an association among the co-defendants, i.e., that they belonged to a gang, BGB, and that as a gang there were a set of ethos, as testified to by gang expert Lieutenant Echevarria, which in gave rise to their collective

53

conspiratorial motive, to murder the victim. In other words, the rap videos and lyrics were evidence of association and of BGB's drug dealing, which went to both the conspiracy and motive to kill the victim.

### C. Lieutenant Echevarria's Expert Testimony

Lieutenant Echevarria's expert testimony was crucial to both the existence of the alleged conspiracy and to the motive. As a gang expert he testified about gangs in general and specifically about BGB. He opined on the values that are important to gangs such as loyalty, respect, and instilling fear. As to BGB, he explained how this Pottstown gang arose out of predecessor Pottstown gangs, its various members, and decoded gang and drug jargon in the BGB videos and lyrics exemplifying the gang ethos. All of his testimony went to association of the co-defendants as BGB members as in the case of Brinkley and co-defendant Lee or simply affiliated with BGB members, as in the case of co-defendant Goins. Accordingly, the motion in *limine* requesting exclusion of this expert testimony was properly denied.

### D. Instagram Account

At the June 23, 2021 Pre-Trial Motions Hearing the Commonwealth stated that in the Defendants' motions in *limine* they contemplated that the Commonwealth would seek to introduce certain forms of evidence related to gang affiliation related to BGB, namely witness testimony, rap videos, rap lyrics, gang related tattoos, social me3dia posts, and testimony from gang expert, Lieutenant Echevarria. (N.T., Pre-Trial Motions Hearing,

54

6/23/21, p. 10). The evidence that was contemplated by defendants included, in part, social media posts related to BGB, relating to Brinkley. Id. at 10, 12.

The reason this Court admitted this evidence is the same as to the other gang related evidence. In particular however, Lee's social media account provided relevant and highly probative evidence of the gang mentality; gang ethos of loyalty and respect. It also went to Lee's association with co-defendant Goins. Additional Instagram account evidence belonging to co-defendant Brinkley also demonstrated the association with the gang, the gang trap house, and to the gang mentality. This evidence was highly probative to the issue of association which goes to conspiracy and to the drug-related motive. The probative value outweighed any prejudice and was properly admitted at trial.

IV.    Jamar Baird's Grand Jury Testimony

Lee's fifth issue on appeal alleges that this Court erred in permitting the Commonwealth to introduce the Grand Jury Testimony of Jamar Baird, which implicated defendant and his co-defendants in the crime, where Mr. Baird took the witness stand at trial, but indicated that he did not remember in response to most questions put to him.

On day three of the trial, Jamar Baird was called to testify. (N.T., Trial by Jury – Day 3 of 8, 1/5/22, p. 108). He refused to answer any of the Commonwealth's questions. Id. at 108 – 109. Rather, he sat on the witness stand in silence. Id. This Court warned Mr. Baird that a failure to answer questions could result in a contempt of court, and was sent back to the jail to think about how he wanted to proceed. Id. at 110.

55

Later, Mr. Baird was brought back to testify. He stated that in 2019, he lived in Pottstown. Id. at 155. On March 30, 2019, he acknowledged that he was hanging out with a bunch of people at Chestnut and Evans Streets. Id. While he stated that there were a lot of people there, he did not remember anyone specific being there. Id. When asked specifically, Mr. Baird agreed that his girlfriend, Denasia, was present at the gathering, but knew no further details. Id. at 156. The Commonwealth next asked Mr. Baird if he remembered testifying before the Montgomery County Grand Jury, and he did remember that he was there and that he was asked questions. Id. He could not recall whether he answered those questions. Id. at 156 – 157. The Commonwealth introduced the transcript of Mr. Baird's grand jury testimony taken on May 15, 2019. Id. at 157 ; see also, Exhibit "C-100." Next, the following exchange occurred:

> [THE COMMONWEALTH]: Okay. I'm going to read you this question, and I'm going to ask you to read me the answer. Okay?
>
> "Do you know who lived at Chestnut and Evans when - - when you were there?
>
> Is that what it - - did I read that right?
>
> [MR. BAIRD]: Yeah.
>
> [THE COMMONWEALTH]: Okay. And you answer: "I think they call her - - I think they call her like Cedes or something like that. I don't know."
> Was that you answer?
>
> [MR. BAIRD]: I don't remember.

56

[THE COMMONWEALTH]: Did I read that correctly off that piece of paper?

[MR. BAIRD]: Right.

[THE COMMONWEALTH]: That's what the piece of paper says?

[MR. BAIRD]: Right.

[THE COMMONWEALTH]: Okay. So you were at Chestnut and Evans at Cedes' house. You said your girlfriend, Denasia, was there. Do you remember any of the other individuals that were there?

[MR. BAIRD]: I don't remember.

[THE COMMONWEALTH]: You don't remember?

Okay. Page 17. Okay. I'm going to read this to you.

[GOINS' DEFENSE COUNSEL]: Your Honor, I'd just object at this point, improper questioning of the witness trying to show a prior inconsistent statement.

THE COURT REPORTER: Trying to show ...?

[GOINS' DEFENSE COUNSEL]: A prior inconsistent statement.

[THE COMMONWEALTH]: Judge, he said that he doesn't remember. I'm going through his prior testimony.

[GOINS' DEFENSE COUNSEL]: Your Honor, my response would be I think she should show him the transcript so he can refresh his memory.

THE COURT: Yeah. Are you trying to refresh his memory?

57

[THE COMMONWEALTH]: I can go that route. Sure.

[THE COMMONWEALTH]: All right. So, Mr. Baird, if you can take a look right here, this is page 17, if you can read from Line 3 down through Line 14. Take a look at that. Let me know when you are finished.

[MR. BAIRD]: (Complies.)

[THE COMMONWEALTH]: Finished reading it?

[MR. BAIRD]: Mm-hmm.

[THE COMMONWEALTH]: Does that refresh you recollection as to who was there that you remember?

[MR. BAIRD]: Um ...

***

[MR. BAIRD]: I don't remember.

[THE COMMONWEALTH]: You don't remember?

[MR. BAIRD]: No.

[THE COMMONWEALTH]: I'm going to read this to you.

[MR. BAIRD]: You're saying does it refresh my memory. I'm saying - -

[THE COMMONWEALTH]: Right. And you're saying it doesn't refresh your memory?

[MR. BAIRD]: Not for the people, no.

[THE COMMONWEALTH]: Okay. The question here, it says, "Tell me who you remember that was there."

Did I read that correctly?

58

[MR BAIRD]: Right.

[THE COMMONWEALTH]: "My girlfriend, Kelise; Swizz was parked up; my man, my friend, E."

"A?

"E, the letter E. That's all I remember from really out there."

Did I read that correctly?

[MR. BAIRD]: Yes.

[THE COMMONWEALTH]: That's what the paper say?

Okay. When you went to Chestnut and Evans, do you remember about what time that was, Mr. Baird?

[MR. BAIRD]: Around like 5:00, 6:00 I don't - - I don't remember

Id. at 157 – 161. Mr. Baird was able to answer several of the Commonwealth's questions without the assistance of the grand jury transcript. Id. at 161 – 165. Further in his testimony, Mr. Baird's memory was refreshed with the grand jury transcript. Id. at 166 – 167. Additional portions of the grand jury transcript was read into evidence, when Mr. Baird's recollection could not be refreshed. Id. at 169.

Initially, this Court notes that there was never an official objection to the introduction of the grand jury transcript by Lee's defense counsel; therefore, this issue is waived on appeal. Pa.R.A.P. 302(a). Even if it was properly preserved for appellate review, this Court submits that the grand jury

59

testimony was properly admitted into evidence under Pa.R.E. 803.1(4), which

reads as follows:

### Rule 803.1. Exceptions to the Rule Against Hearsay--Testimony of Declarant Necessary

The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:

*Comment:* A witness must be subject to cross-examination regarding the prior statement. *See Commonwealth v. Romero*, 722 A.2d 1014, 1017-1018 (Pa. 1999) (witness was not available for cross-examination when witness refused to answer questions about prior statement:

\*\*\*

**(4) Prior Statement by a Declarant-Witness Who Claims an Inability to Remember the Subject Matter of the Statement.** A prior statement by a declarant-witness who testifies to an inability to remember the subject matter of the statement, unless the court finds the claimed inability to remember to be credible, and the statement:

(A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;

(B) is a writing signed and adopted by the declarant; or

(C) is a verbatim contemporaneous electronic recording of an oral statement.

*Comment:* Pa.R.E. 803.1(4) has no counterpart in the Federal Rules of Evidence. The purpose of this hearsay exception is to protect against the "turncoat witness" who once provided a statement, but now seeks to deprive the use of this evidence at trial. It is intended to permit the admission of a prior statement given under demonstrably reliable and trustworthy

60

circumstances, see, e.g., *Commonwealth v. Hanible*, 30 A.3d 426, 445 n. 15 (Pa. 2011), when the declarant-witness feigns memory loss about the subject matter of the statement.

A prior statement made by a declarant-witness having credible memory loss about the subject matter of the statement, but able to testify that the statement accurately reflects his or her knowledge at the time it was made, may be admissible under Pa.R.E. 803.1(3). Otherwise, when a declarant-witness has a credible memory loss about the subject matter of the statement, see Pa.R.E. 804(a)(3).

Pa.R.E. 803.1.

In this case, Mr. Baird's grand jury testimony fell within this exception. His grand jury testimony was given under oath subject to penalty or perjury, and at trial he was subject to cross-examination about his grand jury testimony. Mr. Baird at first refused to answer the Commonwealth's questions, and simply sat on the witness stand without even acknowledging that a question had been asked of him. He sat there in silence. Then he was warned that he could face contempt charges, and this Court permitted him time to consider how he wanted to move forward. Once back on the stand, again Mr. Baird was resistant to the Commonwealth's questions. He stated he "didn't remember" when the Commonwealth began to question him. When the Commonwealth attempted to refresh his memory with the grand jury transcript he denied that that had helped. Based upon on the demeanor and conduct of Mr. Baird, this Court made the credibility determination that his memory loss was feigned, and his claim to not remember was not credible at all. This is exactly the purpose of Rule 803.1(4), which permits a trial court to determine whether the inability to remember is credible. Having determined it was not,

61

that the grand jury testimony was taken under oath, and that Mr. Baird was subject to cross-examination of this grand jury testimony, it was properly admitted at trial.

V.    Elijah William's Testimony

In Lee's sixth issue on appeal he asserts that this Court erred in admitting the supposed confession of co-defendant Brinkley through the trial testimony of Elijah Williams because Brinkley was not available to be cross-examined by Lee with regard to his supposed confession. At issue here is whether this Court properly admitted the testimony of Commonwealth witness Elijah Williams. This issue is waived on appeal. Lee's defense counsel never objected to the admission of Mr. Williams' testimony prior to trial or at trial, and was not properly preserved for appellate review.

## CONCLUSION

Based upon the foregoing analysis, Brinkley's judgment of sentence entered on January 13, 2022, should be affirmed.

BY THE COURT:

_____
WILLIAM R. CARPENTER     J.
COURT OF COMMON PLEAS
MONTGOMERY COUNTY
PENNSYLVANIA
38TH JUDICIAL DISTRICT

62

**Copies sent on June 15, 2022**
**By Electronic Mail to:**

Robert Falin, Esquire, Deputy District Attorney, Chief of Appellate Division;
RFalin@montcopa.org

Brooks T. Thompson, Esquire; brooks@mcmahon4law.com

Denise S. Vicario, Esquire, Executive Director; opinions@montgomerybar.org

Paul DAnnunzio; PDAnnunzio@alm.com


**Copies sent on June 15, 2022**
**By First Class Mail to:**
Jaquan Marquis Lee #QN7650
SCI Greene
169 Progress Drive
Waynesburg, PA 15370

*Christina M Baylion*

Judicial Assistant

63